1  J. DANIEL SHARP (SBN 131042)
   dsharp@crowell.com
2  JOSHUA THOMAS FOUST (SBN 296285)
   jfoust@crowell.com
3  BELINDA Y. LIU (SBN 303455)
   bliu@crowell.com
4  CROWELL & MORING LLP
   3 Embarcadero Center, 26th Floor
5  San Francisco, CA 94111
   Telephone:    (415) 986-2800
6  Facsimile:    (415) 986-2827
7
8  *Attorneys for Defendants*
   *Janet Napolitano, Carol Christ,*
9  *Stephen Sutton, and Anthony Garrison*
10
11              UNITED STATES DISTRICT COURT
12    NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

13  YOUNG AMERICANS FOR LIBERTY AT           Case No. 3:17-cv-06899-JD
    UNIVERSITY OF CALIFORNIA
14  BERKELEY, an unincorporated association   **DEFENDANTS' NOTICE OF MOTION**
    on behalf of itself and its members; and  **AND MOTION TO DISMISS**
15  KHADER KAKISH,                            **PLAINTIFFS' AMENDED COMPLAINT**
                                              **(FED. R. CIV. P. 12(B)(1), (6));**
16              Plaintiffs,                   **MEMORANDUM OF POINTS AND**
                                              **AUTHORITIES IN SUPPORT**
17              v.
                                              _____
18  JANET NAPOLITANO, in her official
    capacity as President of the University of  Date:    April 26, 2018
19  California and in her individual capacity;   Time:    10:00 am
    CAROL CHRIST, in her official capacity as    Place:   Courtroom 11, 19th Floor
20  Chancellor of the University of California,  Judge:   James Donato
    Berkeley, and in her individual capacity;
21  STEPHEN SUTTON, in his official capacity
    as Interim Vice Chancellor of Student Affairs
22  of the University of California, Berkeley, and
    in his individual capacity; and ANTHONY
23  GARRISON, in his official capacity as LEAD
    Center Director at the University of California,
24  Berkeley,
25              Defendants.
26
27
28

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................................ ii

NOTICE OF MOTION TO DISMISS ........................................................................................ v

STATEMENT OF THE ISSUES TO BE DECIDED ................................................................ v

MEMORANDUM OF POINTS AND AUTHORITIES ........................................................... 1

I.      INTRODUCTION ............................................................................................................ 1

II.     BACKGROUND................................................................................................................ 3

        A.      University Regulations Governing Student Organizations ....................... 3

        B.      LEAD Center Procedures ................................................................................ 4

        C.      After Gaining Recognition in 2012, YAL Did Not Re-Register
                in Later Years. ................................................................................................... 5

        D.      Before Completing Its "New RSO" Application for 2017-18,
                YAL Filed Suit. .................................................................................................. 5

        E.      YAL Regained RSO Status After Completing the Re-registration Process.............. 6

III.    STANDARD ...................................................................................................................... 7

        A.      Fed. R. Civ. P. 12(b)(1) ..................................................................................... 7

        B.      Fed. R. Civ. P. 12(b)(6) ..................................................................................... 8

IV.     ARGUMENT ..................................................................................................................... 8

        A.      There Is No "Actual Case or Controversy" Here to Ground Jurisdiction. ................. 8

        B.      The Issues Raised by the Complaint Are Not Fit for Decision, and
                Plaintiffs Will Suffer No Hardship if This Court Declines Jurisdiction. ................. 11

        C.      The Complaint Fails to State a Claim for Violation of the First Amendment. ....... 12

        D.      The Complaint Fails to State an Equal Protection Claim........................................ 14

        E.      Qualified Immunity Bars Plaintiffs' Claims for Damages. ..................................... 15

V.      CONCLUSION ................................................................................................................ 16

# **TABLE OF AUTHORITIES**

Page(s)

**Cases**

*Alaska Right to Life v. Feldman,*
  504 F.3d 840 (9th Cir. 2007)........................................................................................7, 12

*Ashcroft v. Al-Kidd,*
  131 S. Ct. 2074 (2011) ....................................................................................................15

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009) ..........................................................................................................8

*Barren v. Harrington,*
  152 F.3d 1193 (9th Cir. 1998), *cert. denied,* 525 U.S. 1154 (1999) .......................14

*Bd. of Regents of Univ. of Wis. Sys. v. Southworth,*
  529 U.S. 217 (2000) ...................................................................................................10, 12

*Branch v. Tunnell,*
  14 F.3d 449 (9th Cir. 1994) .............................................................................................13

*Christian Legal Soc'y Chapter of Univ. of Cal. v. Martinez,*
  561 U.S. 661 (2010) ..........................................................................................12, 13, 14

*City of Cleburne v. Cleburne Living Ctr.,*
  473 U.S. 432 (1985) .........................................................................................................15

*Davis v. Powell,*
  901 F. Supp. 2d 1196 (S.D. Cal. 2012) ..........................................................................15

*Galbraith v. Cnty. of Santa Clara,*
  307 F.3d 1119 (9th Cir. 2002)..........................................................................................13

*Hall v. Beals,*
  396 U.S. 45 (1969) ............................................................................................................11

*Kaahumanu v. Hawaii,*
  682 F.3d 789 (9th Cir. 2012)............................................................................................13

*Lee v. City of Los Angeles,*
  250 F.3d 668 (9th Cir. 2001)............................................................................................14

*McCarthy v. United States,*
  850 F.2d 558 (9th Cir. 1988)..............................................................................................7

*Nat'l Inst. of Family & Life Advocates v. Harris,*
  839 F.3d 823 (9th Cir. 2016)..................................................................................8, 11, 12

DEFENDANTS' MOTION TO DISMISS AM. COMPLAINT

*Pac. Legal Found. v. State Energy Res. Conservation & Dev. Comm'n,*
659 F.2d 903 (9th Cir. 1981)..................................................................11

*Portland Police Ass'n v. Portland,*
658 F.2d 1272 (9th Cir. 1981).................................................................8

*ProtectMarriage.com – Yes on 8 v. Bowen,*
752 F.3d 827 (9th Cir. 2014)..........................................................7, 8, 11

*Rosenberger v. Rector & Visitors of Univ. of Va.,*
515 U.S. 819 (1995)............................................................................12, 13

*Santa Monica Food Not Bombs v. City of Santa Monica,*
450 F.3d 1022 (9th Cir. 2006).................................................................13

*Shell Petroleum, N.V. v. Graves,*
570 F. Supp. 58 (N.D. Cal. 1983)............................................................11

*Southworth v. Bd. of Regents of Univ. of Wis. Sys.,*
307 F.3d 566 (7th Cir. 2002)...................................................................10

*Sprewell v. Golden State Warriors,*
266 F.3d 979 (9th Cir. 2001)...................................................................13

*Starr v. Baca,*
652 F.3d 1202 (9th Cir. 2011).................................................................8

*Steckman v. Hart Brewing, Inc.,*
143 F.3d 1293 (9th Cir. 1998).................................................................9

*Stormans, Inc. v. Selecky,*
586 F.3d 1109 (9th Cir. 2009)...........................................................11, 12

*Texas v. United States,*
523 U.S. 296 (1998)............................................................................8, 10

*U.S. W. Commc'ns v. MFS Intelenet, Inc.,*
193 F.3d 1112 (9th Cir. 1999).................................................................11

*Warth v. Seldin,*
422 U.S. 490 (1975)................................................................................10

*White v. Lee,*
227 F.3d 1214 (9th Cir. 2000)..................................................................7

**Statutes**

42 U.S.C. § 1983 ......................................................................................14

**Rules**

Fed. R. Civ. P. 12(b) ................................................................................................ *passim*

**Other Authorities**

2 W. Moore, *et al.*, *Moore's Federal Practice*, Par. 12.30[4] (3d ed. 1999) ...................................7

# NOTICE OF MOTION AND MOTION TO DISMISS

PLEASE TAKE NOTICE that on April 26, 2018, at 10:00 am, or as soon thereafter as the matter may be heard before the Honorable James Donato of the United States District Court for the Northern District of California, Courtroom 11, on the 19th floor of the United States Courthouse at 450 Golden Gate Avenue, San Francisco, Defendants Janet Napolitano, Carol Christ, Stephen Sutton, and Anthony Garrison ("Defendants") will and hereby do move this Court to dismiss Plaintiffs' Amended Complaint pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure, on the grounds that (1) the Amended Complaint does not allege, and the evidence adduced does not show, an "actual case or controversy"; and (2) the First Amended Complaint fails to state a claim against Defendants.  Defendants' motion is based on the accompanying Memorandum of Points and Authorities; the declaration of Marissa Reynoso, and the exhibits attached thereto; the pleadings and papers filed herein; and the argument of counsel at the time of the hearing or otherwise.

# STATEMENT OF THE ISSUES TO BE DECIDED

1.      Whether this dispute is ripe and justiciable as an "actual case or controversy," given that (a) the University has recognized Plaintiff's status as a registered student organization ("RSO") in past years, and has never denied Plaintiffs recognition in practice; (b) Plaintiffs have in fact obtained the recognition they seek; and (c) the requirements that Plaintiffs challenge do not, and will not, apply to any future applications for re-registration by Plaintiffs.

2.      Whether the Amended Complaint fails to state a claim for violation of Plaintiffs' First Amendment rights, given that (a) the University Regulations governing the recognition of RSOs require only that student groups meet neutral requirements that have nothing to do with viewpoint, and (b) Plaintiffs have not alleged that the University ever applied these Regulations in practice to deny recognition to any identified student groups.

3.      Whether the Amended Complaint fails to state a claim for violation of the Fourteenth Amendment's Equal Protection Clause.

4.      Whether the doctrine of qualified immunity protects Defendants from Plaintiffs' claims for monetary damages.

1
## MEMORANDUM OF POINTS AND AUTHORITIES

2
## I.  Introduction

3
      The First Amended Complaint of Plaintiff Young Americans for Liberty ("YAL") is a

4
constitutional theory in search of a real-world injury.  YAL alleges that the University of

5
California, Berkeley ("UCB" or "the University") "maintains a policy that excludes" YAL and

6
other like-minded organizations from the "marketplace of ideas" on the Berkeley campus, such

7
that federal litigation is necessary to "vindicate and safeguard" YAL's First Amendment rights

8
against the University's discriminatory policy.  (First Am. Compl. ¶¶ 1-4.)  But the University

9
recognized YAL's Berkeley branch as a registered student organization ("RSO") as early as 2012,

10
entitling YAL to use University funding and facilities for student events.

11
      Far from being excluded or discriminated against, YAL enjoyed RSO status at UCB until

12
the fall of 2014, when its student officers declined to renew the group's registration.  YAL's

13
officers applied again for RSO status in the fall of 2015, but abandoned that application after

14
choosing instead to join another RSO, Cal Libertarians.  Thus, the University long ago granted

15
YAL the RSO status it complains of being denied, and its registration lapsed without any act by

16
the University, due to the migration of YAL's leaders to another RSO with a similar mission.

17
      Under the University's viewpoint-neutral RSO regulations, YAL could have re-activated

18
its registration as a "returning organization" with a simple application, even after a year or more of

19
inactivity.  In September 2017, one day before the deadline, Plaintiff Khader Kakish instead

20
submitted a "New Organization Interest Form" as if YAL were brand new to UCB, without

21
disclosing that YAL had already registered in past years.  The University requires all "new"

22
student organizations to complete an application process that includes an in-person meeting with a

23
student Peer Leadership Consultant, as well as submitting a description of how the proposed new

24
organization differs from existing RSOs.  This student-to-student application procedure furthers

25
the University's educational mission of fostering students' organizational and leadership skills and

26
encouraging students to explore the merits of existing groups.

27
      A day after submitting his application, Plaintiff Kakish received an introductory email

28
from a student "Peer Leadership Consultant," responding to YAL's New Organization Interest

DEFENDANTS' MOTION TO DISMISS AMENDED COMPLAINT

1   Form, encouraging YAL "to meet with Cal Libertarians to see if you can mutually benefit from

2   the ideas of your proposed organization," and inviting YAL to "schedule an appointment" with

3   UCB staff if Mr. Kakish "would still like to create a new organization." (Amended Complaint,

4   Exh. 2). This response merely invited further action and in no way denied Plaintiffs' application.

5   Plaintiffs declined to meet with this Peer Leadership Consultant, respond to her email, or

6   otherwise pursue the application process. Instead, YAL rushed into court, mischaracterizing the

7   student's email as a "denial" of RSO status.

8        After the initial Complaint was filed, the parties realized that YAL was not, in fact, a new

9   student organization, and that Plaintiff Kakish should not have submitted a "New Organization

10  Interest Form." Once these facts were ascertained, YAL successfully re-activated its RSO status.

11  Thus, at the time YAL filed suit, it faced no real impediment to reactivating its registration under

12  the University's RSO policy.

13       Recognizing that there has never been a genuine controversy over its RSO status, YAL

14  filed a First Amended Complaint that continues to claim that YAL is the victim of viewpoint

15  discrimination by the University. This challenge must fail, as Plaintiffs are effectively seeking to

16  manufacture a constitutional "controversy" on paper where none lies in fact. The Amended

17  Complaint does not, and cannot, challenge Berkeley's Regulations implementing University

18  Policies, which require only that student groups seeking RSO status meet plainly viewpoint-

19  neutral requirements—namely, (1) submitting a constitution and by-laws, and (2) registering at

20  least four student-members as "authorized representatives." Neither the Regulations nor any other

21  University Policies prohibit an aspiring RSO from being "too similar" to other student groups.

22       Instead of challenging the University's actual Regulations, the First Amended Complaint

23  invents the term "RSO Recognition Policies" to distort the University's written Regulations. (See

24  Am. Compl. ¶ 56.) Plaintiffs contend that the University's "RSO Recognition Policies" include an

25  "unwritten practice" to "selectively exclude" minority viewpoints deemed "too similar" to existing

26  groups. But Plaintiffs fail to allege facts demonstrating that this asserted "unwritten practice" is

27  anything other than hypothetical. The Amended Complaint does not, and cannot, allege that the

28  University *denied* RSO status to YAL—or any other identified student group, for that matter—on

the ground of being "too similar" to an existing organization.  It does not violate the Constitution for the University to require students, during the application process, to *consider* whether a previously registered student group is already meeting the needs and purpose of their proposed new organization.  The educational process by which students develop organization and leadership skills requires that students communicate with one another and make informed decisions about whether their proposed group will be duplicative of an existing one.

Without an actual or threatened injury, Plaintiffs have not only failed to state a viable claim; they have not sufficiently invoked this Court's jurisdiction, which is limited to "actual cases and controversies" under Article III of the Constitution.  Accordingly, and for the reasons that follow, Defendants respectfully request that the Amended Complaint be dismissed.

## II.   Background

### A.   University Regulations Governing Student Organizations

As part of its educational mission, the University of California, Berkeley, encourages students to form groups and organizations.  (Reynoso Decl. ¶ 3; First Amended Verified Complaint ["Amended Complaint"] ¶ 52.)  The University also encourages students who are interested in forming and leading groups to interact with one another, which helps them expand their thinking and develop leadership and organizational skills.  (Reynoso Decl. ¶ 3.)  Towards this end, the University staffs and operates a Center for Student Leadership, commonly referred to as the LEAD Center.  (*Id.* ¶ 2.)

Questions regarding whether student groups can claim to be "sponsored" or officially affiliated with the University, use the University's name and logo, and access University property are addressed in the Berkeley Campus Regulations ("Regulations"), which the University makes available to the public online.  (Reynoso Decl. ¶ 6, Exh. C; *see also* University of California, Berkeley, "Berkeley Campus Regulations Implementing University Policies," *available at* http://sa.berkely.edu/uga/regs (last accessed Mar. 12, 2018).)  The Regulations clarify and define

DEFENDANTS' MOTION TO DISMISS AMENDED COMPLAINT

1   the rights, privileges, and responsibilities of people on the UCB campus, whether they be students,

2   faculty, staff, guests, or members of the community unaffiliated with the University.[1]   (*Id.*)

3        This case centers on YAL's application for recognition as a "Registered Campus

4   Organization," also referred to as a "Registered Student Organization" or "RSO."  (Am. Compl.

5   ¶¶ 52, *et seq.*)  Under the Regulations, "Registered Campus Organization" denotes any group of

6   students with a common interest, with no required connection to the University's mission and

7   policies.  (Reynoso Decl. Exh. C (Regulations, General Definition (d)).)

8        Section 121 of the Regulations establishes the requirements for a group to become a

9   Registered Student Organization.  They are not onerous.  The student organization must (1) submit

10  a copy of the group's constitution and by-laws, which become public documents available for

11  inspection; and (2) complete an application signed by at least four members of the organization

12  ("Signatories"), with an email address or phone number for at least one member to be listed on the

13  LEAD Center's website.  (Reynoso Decl. ¶ 7, and Exh. C (Regulation 121).)  The Regulations do

14  not require that an RSO be "unique" from other student groups.  (*Id.*)

15       **B.      LEAD Center Procedures**

16       Section 121 of the Regulations contemplates that its requirements will be implemented by

17  "procedures established by the Center for Student Leadership" [*i.e.*, the LEAD Center].  (Reynoso

18  Decl. ¶ 7, and Exh. C (Regulation 121).)  The LEAD Center's website sets out publicly the

19  procedures for students to register their organizations in compliance with Section 121 of the

20  Regulations.  (Reynoso Decl. ¶¶ 8-10, and Exhs. E and F.)  As part of the procedures

21  implementing the Regulations, the LEAD Center requires students seeking to register a new group

22  to complete an application process that includes meeting with a student "Peer Leadership

23  Consultant," as well as "clarify[ing] how [the] proposed organization is different from other

24  existing student organization at [UCB] and how [the] group will have a positive impact on the

25  university community."  (*See, e.g.*, University of California, Berkeley, "Register Your New

26

27

28  ───────────────────

[1] YAL's Amended Complaint does not mention the Regulations, instead inventing the term "RSO
Recognition Policies" to re-characterize the University's written Regulations.  (Am. Compl. ¶ 56.)

1   Student Org – LEAD Center," *available at* http://lead.berkeley.edu/manage-your-

2   organization/new-rso-registration (last accessed Mar. 12, 2018); *see also* Reynoso Decl. ¶¶ 9, 11.)

3          The LEAD Center does not grant or deny RSO applications based on these "statements of

4   uniqueness," which the Regulations do not mandate.  Rather, the procedural requirement that

5   students articulate how their proposed group is different from existing RSOs is one way in which

6   the LEAD Center furthers the University's educational mission.  (How many chess clubs does one

7   campus need?)  Requiring student applicants to consider the merits of existing organizations, and

8   encouraging them to communicate with one another, promotes the University's goal of fostering

9   organizational and leadership skills—not only for the student applicants, but also the student Peer

10  Leadership Consultants who help administer the program.  (*See* Reynoso Decl. ¶¶ 11-12.)

11         **C.      After Gaining Recognition in 2012, YAL Did Not Re-Register in Later Years.**

12         Plaintiff Young Americans for Liberty ("YAL") is a student association at Berkeley that is

13  affiliated with a national organization headquartered in Arlington, Virginia.  (*See* Am. Compl.

14  ¶ 13; *see also* Young Americans for Liberty, "Chapter Directory," *available online at*

15  https://yaliberty.org/chapter-directory (last accessed Mar. 12, 2018).)  In 2012, YAL received

16  recognition from UCB as an RSO.  (Reynoso Decl. ¶ 13.)  After registering again for 2013-2014,

17  YAL declined to complete the registration process for the next three academic years (*i.e.*, 2014-

18  2015, 2015-2016, 2016-2017).  (*Id.* ¶¶ 15-16, and Exh. G.)  According to UCB's records, three of

19  the four signatories to YAL's 2015-2016 application (which was never completed) were

20  signatories on the 2016-2017 application of another RSO, Cal Libertarians.  (*Id.* ¶ 15, and Exhs. F,

21  G.)  YAL was put on inactive or "frozen" status for these years.  (Reynoso Decl. ¶ 17.)

22         **D.      Before Completing Its "New RSO" Application for 2017-18, YAL Filed Suit.**

23         As a "frozen" RSO, YAL was eligible to re-activate its registration by submitting a re-

24  registration form with at least four signatories, and having at least two of the signatories attend an

25  in-person orientation.  (Reynoso Decl. ¶ 10, and Exh. F.)  These are the same requirements for re-

26  registering an active student organization.  (*Id.*)  YAL, however, did not submit an application to

27  re-register for the Fall 2017 semester.  Instead, on September 26, 2017—only one day before the

28  posted deadline—Plaintiff Khader Kakish submitted online a "New Organization Interest Form"

DEFENDANTS' MOTION TO DISMISS AMENDED COMPLAINT

for YAL to become a "new" RSO.  (*See* Am. Compl., Exh. 1.)  The application listed "Cal

Libertarians" in the space provided for listing "any organization similar to yours."  (*See id.* at 7.)

The next day, a student "Peer Leadership Consultant" with the LEAD Center sent an email

to Mr. Kakish to follow up on the application.[2]  (Am. Compl., Exh. 2.)  That email read:

> After reviewing your submission, we have determined that your proposed
> organization is too similar to Cal Libertarians and therefore does not meet the
> qualifications for creating a new organization. We encourage you to meet with Cal
> Libertarians to see if you can mutually benefit from the ideas of your proposed
> organization. **If you are unable to work with Cal Libertarians and would still like
> to create a new organization, please call (510) 642-5171 to schedule an
> appointment with a LEAD Center advisor and notify the staff on the phone that
> you are setting an appointment for your statement of uniqueness for a new
> organization.** At the meeting with the LEAD Center advisor, you will be required to
> show the efforts made to work with Cal Libertarians.

(Am. Compl., Exh. 2 (emphasis added).)  Mr. Kakish did not respond to this email or schedule an

appointment with a Peer Leadership Consultant.  Nor did he contact anyone in the UCB

Administration.  (Reynoso Decl. ¶ 23.)  Instead, on December 4, 2017, YAL filed suit.

**E.      YAL Regained RSO Status After Completing the Re-registration Process.**

On January 8, 2018, Marissa Reynoso, the Director for Student Organization Advising &

Leadership Development and Associate Director at the LEAD Center, reached out to Mr. Kakish

to follow up on YAL's incomplete application for new RSO status submitted in September 2017.

(Reynoso Decl. ¶ 25, and Exh. I.)  Ms. Reynoso invited Mr. Kakish to continue with the

application and reiterated the remaining steps in the process, including the required meeting with

LEAD Center staff members.  On January 25, 2018, another LEAD Center staff member,

Millicent Morris-Chaney, emailed Mr. Kakish to schedule this meeting and explain that YAL, as a

returning RSO, was eligible to re-register, rather than apply as a new organization.  (Reynoso

Decl. ¶¶ 26-27, and Exh. K.)  Plaintiffs completed all of the re-registration steps by the Spring

2018 deadline of February 2, 2018.  (Reynoso Decl. ¶ 28.)

---

[2] "Peer Leadership Consultant" are student volunteers at the LEAD Center who provide
consultation, advice, and administrative support to other students in connection with the RSO
program.  (Reynoso Decl. ¶ 4.)  A Peer Leadership Consultant does not have authority to terminate
a new organization's application to register as an RSO.  (*Id.*)

1    As a result of completing its application, YAL has been restored to active RSO status at

2  Berkeley.  (*Id.* ¶ 28, and Exh. L.)  The group is now listed as an active RSO in the LEAD Center's

3  RSO directory, publicly available on the CalLink website.  (*See* University of California,

4  Berkeley, "Organizations," *available at* https://calink.berkeley.edu/organizations (last accessed

5  Mar. 12, 2018).)  On February 21, 2018, shortly after successfully reactivating its RSO status,

6  YAL hosted an event featuring David Boaz, Executive Vice President of the Cato Institute, using

7  University meeting space.  (Reynoso Decl. ¶ 29, and Exh. M.)

8  **III.    Standard**

9       **A.    Fed. R. Civ. P. 12(b)(1)**

10    A defendant may move under Rule 12(b)(1) to dismiss any action in which the district

11  court lacks subject-matter jurisdiction under Article III of the Constitution.  *White v. Lee*, 227 F.3d

12  1214, 1242 (9th Cir. 2000).  "[W]hen considering a motion to dismiss pursuant to Rule 12(b)(1)

13  the district court is not restricted to the face of the pleadings, but may review any evidence, such

14  as affidavits and testimony, to resolve factual disputes concerning the existence of jurisdiction."

15  *McCarthy v. United States*, 850 F.2d 558, 560 (9th Cir. 1988) (citing *Land v. Dollar*, 330 U.S.

16  731, 735 n.4 (1947)).  Likewise, the Court "need not presume the truthfulness of the plaintiffs'

17  allegations" if contradicted by the evidence.  *White*, 227 F.3d at 1242 (citing 2 W. Moore, *et al.*,

18  *Moore's Federal Practice*, Par. 12.30[4], at 12-38 (3d ed. 1999)).

19    "Federal jurisdiction is limited to actual cases and controversies."  *Alaska Right to Life v.*

20  *Feldman*, 504 F.3d 840, 848 (9th Cir. 2007) (quoting *Allen v. Wright*, 468 U.S. 737, 750 (1984))

21  (internal quotation marks omitted).  "This means that, at all stages of the litigation, the plaintiff

22  must have suffered, or be threatened with, an actual injury traceable to the defendant that is likely

23  to be redressed by a favorable judicial decision."  *ProtectMarriage.com – Yes on 8 v. Bowen*, 752

24  F.3d 827, 834 (9th Cir. 2014) (quoting *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 477 (1990))

25  (internal quotation marks and alterations omitted).  "[A] federal court [thus] loses its jurisdiction

26  to reach the merits of a claim" as soon as it becomes clear that "the court can no longer effectively

27  remedy a *present* controversy between the parties."  *Id.* at 836 (emphasis added).

28

1

    **B.**    **Fed. R. Civ. P. 12(b)(6)**

2

    Under Federal Rule of Civil Procedure 12(b)(6), a complaint may only survive a motion to

3

dismiss if it contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is

4

plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v.*

5

*Twombly*, 550 U.S. 544, 570 (2007)).  "[T]o be entitled to the presumption of truth, allegations in

6

a complaint . . . may not simply recite the elements of a cause of action, but must contain

7

sufficient allegations of underlying facts to give fair notice and to enable the opposing party to

8

defend itself effectively."  *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011).  Conclusory

9

allegations that assert a legal conclusion "are not entitled to the assumption of truth" and will not

10

defeat a motion to dismiss.  *Iqbal*, 556 U.S. at 679.

11

**IV.**    **Argument**

12

    **A.**    **There Is No "Actual Case or Controversy" Here to Ground Jurisdiction.**

13

    "Before a case is justiciable in federal court [as an 'actual case or controversy' under

14

Article III], . . . the plaintiff [must be] threatened by injury that is both 'real and immediate,' and

15

not 'conjectural' or 'hypothetical.'"  *Portland Police Ass'n v. Portland*, 658 F.2d 1272, 1273 (9th

16

Cir. 1981)) (quoting *O'Shea v. Littleton*, 414 U.S. 488, 494 (1974)) (internal alterations omitted).

17

Where, as here, the plaintiff is challenging the constitutionality of a government policy, it must

18

"face 'a realistic danger of sustaining a direct injury as a result of [that policy's] operation or

19

enforcement,' not an 'alleged injury [that] is too imaginary or speculative to support jurisdiction.'"

20

*Nat'l Inst. of Family & Life Advocates v. Harris*, 839 F.3d 823, 833 (9th Cir. 2016) (quoting

21

*Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d 1134, 1139 (9th Cir. 1999) (en banc)).

22

    Accordingly, where a claim "rests upon contingent future events that may not occur as

23

anticipated, or indeed may not occur at all," it is "not ripe for adjudication" in federal court.  *Texas*

24

*v. United States*, 523 U.S. 296, 300 (1998) (internal quotation marks and citations omitted).  This

25

is especially true for claims that defendants "selectively" apply a given policy in practice, as "any

26

as-applied challenge based on [the defendants'] future activity fails to tender the underlying

27

constitutional issues in clean cut and concrete form."  *Bowen*, 752 F.3d at 840 (quoting *Socialist*

28

*Labor Party v. Gilligan*, 406 U.S. 583, 588 (1972)) (internal alterations omitted).

1   Plaintiffs face precisely this problem here.  First, and most fundamentally, the Amended

2   Complaint does not identify any University policy that, on its face, would deny RSO status or

3   otherwise discriminate against Plaintiffs on the basis of their expressive activity.  To the contrary,

4   the Berkeley Campus Regulations, which implement University Policies, only require that

5   students seeking to form RSOs meet plainly viewpoint-neutral requirements—namely,

6   (1) submitting a constitution and by-laws, and (2) registering at least four students as "authorized

7   representatives."  These Regulations nowhere require or authorize Defendants to deny RSO status

8   on the basis that a group is "too similar" to existing RSOs.  (Reynoso Decl. ¶¶ 6-7, and Exh. C.)

9   Plaintiffs cannot manufacture a "case or controversy" merely by asserting that Defendants

10  in practice apply the University's viewpoint-neutral Regulations to discriminate against YAL and

11  other unidentified student groups based on their viewpoints.  The Amended Complaint does not,

12  and cannot, allege that Defendants have actually *denied* RSO status to YAL—or *any* other

13  identified student group, for that matter—for being "too similar" to other RSOs.  Although

14  Plaintiffs contend that the LEAD Center "den[ied] YAL's application" via email, the message at

15  issue expressly invited Mr. Kakish to *continue the application process* by "schedul[ing] an

16  appointment with a LEAD Center advisor."  (Am. Compl., Exh. 1.)  By its plain terms, this

17  response is not a "denial" of YAL's application—which sought, incorrectly, to register YAL as a

18  "New Organization" rather than a returning RSO.  Further, while the email did note that Mr.

19  Kakish would "be required [at the next meeting] to show the efforts made to work with Cal

20  Libertarians," it nowhere indicated that the LEAD Center would deny YAL's application if

21  deemed "too similar" to that group.  *Compare* Am. Compl. ¶¶ 84-88 *with* Exh. 2 to Am. Compl.

22  Other than this email, which itself belies Plaintiffs' assertions, the Amended Complaint contains

23  no other well-pleaded facts to support the claim that YAL's application was denied.  *See Steckman*

24  *v. Hart Brewing, Inc.*, 143 F.3d 1293, 1295-96 (9th Cir. 1998) ("[W]e are not required to accept as

25  true conclusory allegations which are contradicted by documents referred to in the complaint.")

26  Indeed, after accepting Defendants' invitation to continue the application process, YAL

27  was once again recognized as an RSO—just as it was in past years in which it completed the re-

28  registration process.  (*See* Am. Compl. ¶ 104; *accord* Reynoso Decl. ¶¶ 13, 15, 28.)  The

1 University's official register of RSOs, available online, now lists YAL as a recognized RSO.

2 (Reynoso Decl. ¶ 28, and Exh. L.)  And YAL has already taken advantage of its RSO status by

3 reserving University facilities to host an event.  (*Id.* ¶ 29, and Exh. M.)  Plaintiffs' asserted

4 injury—the denial of RSO status—is thus a "contingent future event" that does not amount to a

5 "real and immediate injury." *Texas*, 523 U.S. at 300.[3]

6       Nor will Plaintiffs face any threat of this injury if and when they re-register for RSO status

7 for the 2018-2019 academic year.  YAL was recognized as an RSO from as early as 2012 until the

8 fall of 2014, when its members allowed its registration to lapse (and several chose instead to join

9 Cal Libertarians).  (Reynoso Decl. ¶¶ 15-16.)  After first seeking to apply as a "new" organization

10 in September 2017, YAL eventually completed the re-registration process and regained RSO

11 status.  As a returning organization, YAL is now exempt from submitting a "statement of

12 uniqueness" going forward.  (*Id.* ¶¶ 14, and Exh. F.)  Thus, even if Plaintiffs could establish a

13 "realistic danger" that this requirement could be applied to discriminate against minority

14 viewpoints—which they cannot—YAL itself faces no risk of such an injury.  Any assertion to the

15 contrary is speculative, even counter-factual, and cannot ground Article III jurisdiction.

16       Without a "real and immediate injury" of their own, Plaintiffs cannot simply challenge the

17 constitutional merits of the University's policies in the abstract.  YAL, as an unincorporated

18 association, only has standing to litigate the rights of its own constituent members, such as Mr.

19 Kakish—not unaffiliated students, and certainly not other groups, who are not before this Court.

20 *See Warth v. Seldin*, 422 U.S. 490, 510-15 (1975).  As a returning RSO, moreover, YAL will not

21 be subject to the procedural requirement of submitting a "statement of uniqueness" going forward.

22

---

23 [3] For similar reasons, Mr. Kakish's payment of the Berkeley Campus Fee is not a sufficient "injury in fact" to ground this Court's jurisdiction.  As explained *infra*, "[t]he First Amendment

24 permits a public university to charge its students an activity fee used to fund a program to facilitate extracurricular student speech [as long as] the program is viewpoint neutral." *Bd. of Regents of

25 Univ. of Wis. Sys. v. Southworth*, 529 U.S. 217, 221 (2000).  Plaintiffs have not alleged any real-world instances in which the University's viewpoint-neutral regulations were invoked to deny

26 RSO funding to any identified groups.  Thus, the payment of this fee is not, standing alone, an injury to a legally protected interest sufficient to confer standing.  *See, e.g.*, *Southworth v. Bd. of

27 Regents of Univ. of Wis. Sys.*, 307 F.3d 566, 573 (7th Cir. 2002) (for standing purposes, students have a "concrete and particularized interest" only in the "assurance that their mandatory student

28 activity fees are distributed in a viewpoint-neutral manner").

Plaintiffs thus may not seek what would effectively be an "advisory opinion" on the "abstract" constitutional merits of a policy that has not been, and will not be, applied against Mr. Kakish or YAL.  *See Hall v. Beals*, 396 U.S. 45, 48 (1969); *accord Bowen*, 752 F.3d at 834.

### B. The Issues Raised by the Complaint Are Not Fit for Decision, and Plaintiffs Will Suffer No Hardship if This Court Declines Jurisdiction.

This Court also has compelling prudential reasons to exercise its "discretionary power to decline . . . jurisdiction" here, based on "(1) the fitness of the issues for judicial decision; and (2) [the] hardship to the parties if [the Court] were to withhold jurisdiction."  *Harris*, 839 F.3d at 833 (citing *Thomas*, 220 F.3d at 1141-42).  First, Plaintiffs' claims do not raise "fit" issues, as Defendants have not actually applied the alleged policy at issue to YAL or other identified groups.  "A claim is fit for decision if the issues raised are primarily legal, do not require further factual development, and the challenged action is final."  *U.S. W. Commc'ns v. MFS Intelenet, Inc.*, 193 F.3d 1112, 1118 (9th Cir. 1999).  "On the other hand, if the issue[s] would be illuminated by the development of a better factual record, [a] challenged [policy] is generally not considered fit for adjudication until it has actually been applied."  *Pac. Legal Found. v. State Energy Res. Conservation & Dev. Comm'n*, 659 F.2d 903, 915 (9th Cir. 1981).  Here, the policy Plaintiffs challenge was never applied to deny them access to University funding or facilities; indeed, YAL is now recognized once again as an RSO, just as in past years.  Nor does the Amended Complaint cite any other concrete examples of Defendants denying recognition to other identified student groups.  The Complaint's theories as to how this alleged policy *might* be applied going forward thus remain purely speculative, as the "state statute or regulation under attack has not yet been"— and may not ever be—"fully applied to the plaintiff."  *E.g.*, *Shell Petroleum, N.V. v. Graves*, 570 F. Supp. 58, 65 (N.D. Cal. 1983).

Nor will Plaintiffs suffer any "hardship" if this Court declines to exercise jurisdiction over their claims.  In evaluating hardship, courts "consider whether the 'regulation [at issue] requires an immediate and significant change in plaintiffs' conduct of their affairs with serious penalties attached to noncompliance.'"  *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1126 (9th Cir. 2009) (quoting *Ass'n of Am. Med. Colleges v. United States*, 217 F.3d 770, 783 (9th Cir. 2000)).  The

1   onus is on the party asserting hardship to "show that withholding review would result in direct and

2   immediate hardship and entail more than possible financial loss." *Stormans*, 586 F.3d at 1126

3   (quoting *MFS Intelenet*, 193 F.3d at 1118).  In First Amendment challenges, courts typically

4   require that plaintiffs face a "real threat of enforcement"—with the accompanying risk of "civil

5   sanction or criminal penalty"—to establish genuine hardship.  *E.g.*, *Feldman*, 504 F.3d at 844,

6   851; *Harris*, 839 F.3d at 834.

7          Nothing of the sort is at issue here.  YAL has already regained the RSO recognition that it

8   enjoyed from 2012 to 2014, and the alleged policy at issue—which applies only to applications for

9   *new* RSO recognition, *not* for re-registration—will not require YAL to alter its behavior in any

10   meaningful way going forward.  (*See* Reynoso Decl. ¶¶ 9-10.)  "Nor will delaying adjudication

11   prejudice [Plaintiffs'] ability to vindicate [their] constitutional claims later, with a better factual

12   record," if Defendants someday deny RSO status to YAL or other groups on the same challenged

13   grounds—a prospect that remains wholly speculative.  *Feldman*, 504 F.3d at 852.

14          **C.     The Complaint Fails to State a Claim for Violation of the First Amendment.**

15          Plaintiffs have alleged no violation of either their speech or associational rights under the

16   First Amendment.  As the Supreme Court has explained, public university-sponsored RSO

17   programs are "limited public forums," in which restrictions on both "speech and express-

18   association rights" are subject to a "less restrictive" level of scrutiny.  *Christian Legal Soc'y*

19   *Chapter of Univ. of Cal. v. Martinez*, 561 U.S. 661, 680-81 (2010).  A public university may

20   constitutionally limit a student group's access to RSO status if the criteria used (1) are "reasonable

21   in light of the purpose served by the forum," and (2) do not "discriminate against speech on the

22   basis of its viewpoint."  *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829

23   (1995); *accord Christian Legal Soc'y*, 561 U.S. at 667-68.  Similarly, "[t]he First Amendment

24   permits a public university to charge its students an activity fee used to fund a program to facilitate

25   extracurricular student speech [as long as] the program is viewpoint neutral."  *Bd. of Regents of*

26   *the Univ. of Wis. Sys. v. Southworth*, 529 U.S. 217, 221 (2000).

27          Under these well-settled standards, Plaintiffs' First Amendment claims fail on at least two

28   grounds: (1) the University's regulations and procedures governing RSO recognition are both

1   reasonable and viewpoint-neutral; and (2) Plaintiffs do not allege any instances in which

2   Defendants applied them in practice to deny RSO status to YAL or other student groups.

3   Berkeley's Campus Regulations require only that student groups (1) submit a constitution and by-

4   laws, and (2) register at least four student-members as "authorized representatives" in order to

5   qualify for recognition as RSOs.  Contrary to what Plaintiffs assert, these Regulations nowhere

6   require that an aspiring RSO be "unique" from other student groups.[4]  *See Sprewell v. Golden*

7   *State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001) ("The court need not . . . accept as true

8   allegations that contradict matters subject to judicial notice or by exhibit.").  Nothing in the

9   University's Regulations confers "unbridled discretion" on Defendants to discriminate against

10  certain viewpoints, as student groups need only satisfy these specific, neutral requirements in

11  order to qualify for RSO status.  *See Kaahumanu v. Hawaii*, 682 F.3d 789, 804-07 (9th Cir. 2012).

12       Ignoring the Berkeley Campus Regulations, the Amended Complaint instead takes issue

13  with the LEAD Center's implementing procedures—namely, the requirement that student groups

14  submit a "statement of uniqueness" as part of the application process.  But this procedural

15  requirement is neutral on its face: it does not authorize or require the University to draw any

16  "distinction[s] between groups based on their [point of view,] message or perspective."  *Christian*

17  *Legal Soc'y*, 561 U.S. at 694-95; *see also Rosenberger*, 515 U.S. at 829 ("The government must

18  abstain from regulating speech when the specific motivating ideology or the opinion or

19  perspective of the speaker is the rationale for the restriction.").  Its purpose, moreover, is plainly

20  not to keep certain student perspectives out of the "marketplace of ideas," as Plaintiffs contend;

21  rather, it reasonably serves the legitimate educational goals of encouraging dialogue and

22  collaboration among student groups, as well as protecting finite University resources.  *See*

23  *Rosenberger*, 515 U.S. at 829 ("The necessities of confining a forum to the limited and legitimate

24

---

25  [4] As explained in Defendants' Request for Judicial Notice, this Court may take notice of the
    Berkeley Campus Regulations without converting this Rule 12(b)(6) motion to dismiss into a

26  motion for summary judgment because (1) such regulations are "matters of public record," *Santa*
    *Monica Food Not Bombs v. City of Santa Monica*, 450 F.3d 1022, 1025 n.2 (9th Cir. 2006); and

27  (2) the Amended Complaint incorporates these regulations by reference, *Branch v. Tunnell*, 14
    F.3d 449, 454 (9th Cir. 1994), *overruled in part on other grounds*, *Galbraith v. Cnty. of Santa*

28  *Clara*, 307 F.3d 1119 (9th Cir. 2002).

DEFENDANTS' MOTION TO DISMISS AMENDED COMPLAINT

1   purposes for which it was created may justify the State in reserving it for certain groups . . . .").

2   And even if Plaintiffs could allege that this requirement has some "incidental effect on some

3   speakers or messages but not others"—which they have not—"[a] regulation that serves a purpose

4   unrelated to the content of expression is [nonetheless] deemed neutral." *Christian Legal Soc'y*,

5   561 U.S. at 695 (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)).

6          Plaintiffs may protest that, even if this requirement is facially neutral, Defendants

7   selectively apply it in practice to deny RSO status to certain "minority viewpoints," including their

8   own.  But the Amended Complaint does not allege that Defendants have actually applied the

9   procedures at issue to deny RSO access to YAL—or any other student group, for that matter—

10  because of its members' viewpoints.  As explained above, Plaintiffs base their claims entirely on a

11  single email from the LEAD Center inviting Mr. Kakish to continue the application process—an

12  invitation that Plaintiffs declined, instead electing to file this lawsuit.  (*See* Am. Compl., Exh. 2.)

13  Although the LEAD Center did advise Mr. Kakish that he would "be required to show the efforts

14  made to work with Cal Libertarians," nothing in this email suggests that YAL's recognition as an

15  RSO was contingent on the group changing, abandoning, or adopting certain viewpoints.  Nor

16  does the Complaint offer any other specific examples in which UCB has applied this policy to

17  discriminate against identified groups.

18          **D.      The Complaint Fails to State an Equal Protection Claim.**

19          The Complaint's equal protection claim is likewise flawed.  "To state a claim under 42

20  U.S.C. § 1983 for a violation of the Equal Protection Clause of the Fourteenth Amendment[,] a

21  plaintiff must show that the defendants acted with an intent or purpose to discriminate against the

22  plaintiff *based upon membership in a protected class*."  *Barren v. Harrington*, 152 F.3d 1193,

23  1194 (9th Cir. 1998), *cert. denied*, 525 U.S. 1154 (1999) (emphasis added).  Where, as here, the

24  plaintiff does not claim membership in a "suspect class," "a governmental policy that purposefully

25  treats [the plaintiff] differently . . . need only be 'rationally related to legitimate legislative goals'

26  to pass constitutional muster."  *Lee v. City of Los* Angeles, 250 F.3d 668, 686-87 (9th Cir. 2001)

27  (quoting *Does 1-5 v. Chandler*, 83 F.3d 1150, 1155 (9th Cir. 1996)).  When reviewed under this

28

DEFENDANTS' MOTION TO DISMISS AMENDED COMPLAINT

1   "rational basis" standard, the policy at issue is "presumed to be valid." *City of Cleburne v.*

2   *Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985).

3           Plaintiffs have done nothing to overcome this presumption of validity here.  The Berkeley

4   Campus Regulations do not draw *any* distinctions among identifiable groups—much less "suspect

5   classes"—and the Complaint has not alleged that Defendants ever applied these regulations to

6   deny benefits to members of a protected class in practice.  Further, the LEAD Center's informal

7   procedure of requiring RSO applicants to describe how they are "unique" from existing groups is

8   "rationally related" to legitimate, non-discriminatory ends:  such a policy furthers the University's

9   educational mission by encouraging student groups to consider the merits of existing organizations

10  on campus and to communicate with one another about ways they can each contribute to the

11  University community.

12          **E.      Qualified Immunity Bars Plaintiffs' Claims for Damages.**

13          The arguments set forth above apply *a fortiori* to bar Plaintiffs' claims for monetary

14  damages against University officials under the doctrine of qualified immunity.  "Qualified

15  immunity shields . . . state officials from money damages unless a plaintiff pleads facts showing

16  (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly

17  established' at the time of the challenged conduct." *Ashcroft v. Al-Kidd*, 131 S. Ct. 2074, 2080

18  (2011).  Put simply, "[i]f the Defendants' conduct does not amount to a constitutional violation, *or*

19  the violation was not clearly established, *or* the Defendants' actions reflect a reasonable mistake as

20  to what the law requires, they are entitled to qualified immunity." *Davis v. Powell*, 901 F. Supp.

21  2d 1196, 1233 (S.D. Cal. 2012) (citing *Blankenhorn v. City of Orange*, 485 F.3d 463, 471 (9th Cir.

22  2007)) (emphasis added).  Qualified immunity applies to bar Plaintiffs' damages claims here, as

23  none of the individually named Defendants was personally involved in applying the LEAD

24  Center's RSO recognition procedures to specific groups—the conduct that Plaintiffs claim is

25  unconstitutional.  Further, as explained above, the LEAD Center employees who handled YAL's

26  application violated no "clearly established" rights here:  they did not "deny" YAL's application,

27  and the group was granted RSO status as soon as it completed the re-registration process.

28

**V.     Conclusion**

For all the foregoing reasons, Defendants respectfully request that this Court deny Plaintiff's Complaint in its entirety pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure.


Dated:  March 22, 2018                    CROWELL & MORING LLP


                                       /s/ Joshua Thomas Foust

                                       J. Daniel Sharp
                                       Joshua Thomas Foust
                                       Belinda Y. Liu

                                    *Attorneys for Defendants*
                              *Janet Napolitano, Carol Christ,*
                            *Stephen Sutton, and Anthony Garrison*